STOKES MILLING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20298.   Promulgated December 28, 1928.

*A. E. Foley, Esq.*, for the petitioner.
*A. H. Fast, Esq.*, for the respondent.

OPINION.

LANSDON: The controversies over invested capital and the cost of depreciable assets at issue here both hinge on the actual cash value of the property paid in for stock when the petitioner was incor-

porated. The respondent has not held that the provisions of section 331 of the Revenue Act of 1918 are applicable in the determination of the petitioner's invested capital, nor is there any dispute over the rates of depreciation.

The statutory provisions for the computation of invested capital applicable here are set forth in the Revenue Act of 1918, as follows:

SEC. 326. (a) That as used in this title the term "invested capital" for any year means (except as provided in subdivisions (b) and (c) of this section):

(1) Actual cash bona fide paid in for stock or shares;

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus * * *

In support of its contention as to the value of the property paid in for stock at the date of incorporation the petitioner relies on the testimony of one James H. Hammill, who has been a practicing mill engineer for 38 years. As evidence of his qualification to form an opinion of the value of mill properties this witness testified that he designed a 4,000-barrel capacity mill for the Pillsburys of Minneapolis, three mills of 3,000-barrel capacity for Quaker Oats at Cedar Rapids, a 2,000-barrel mill at Ontario, two 1,000-barrel mills at Ogden, and one at Spokane, and redesigned 12,000 and 6,000 barrel capacity mills at Washburn and Marmel; that he has designed, built and started the operation of many mills; and that he has appraised the plants of the Larrabee Milling Co., Wellington, Hutchinson, St. Joseph, and Sioux Falls, and several mills for fire-loss purposes at Jackson, Scandia, and Greensburg; that he has sold and installed flour-milling machinery from coast to coast; that he is frequently called on to readjust interior mill arrangements. During the operation of the property in question by the predecessor of the petitioner, which he has known for about 16 years, he was called on three or four times a year for the purpose of making adjustments required by changes of the types of milling wheat and other conditions. He installed most of the machinery of the Stokes mill and at one time operated it for several days. In the opinion of Hammill the mill buildings of the petitioner had a value of at least $100,000 at April 1, 1916, and at the same date the installed machinery and equipment had a value of $120,000. He based his opinion on his information and experience as a mill engineer, from which he concludes that the

buildings necessary to the successful operation of a 1,000-barrel mill cost $100 and the machinery and equipment $120 per barrel capacity, respectively.

It appears that the Commissioner accepted neither the book value nor the cost of the assets to the prior owners as his basis for the computation of invested capital, but based his determination on the par value of the stock issued for the property.

The sale of the mill by Stokes to the incorporators for $50,000 cash does not appear to have been an arm's-length transaction. Stokes was losing money in the operation of the property. He needed cash for use in his deals in real estate. He was old and anxious to be relieved of the responsibilities and labors incident to the operation of a large manufacturing plant. One of the vendees had been secretary of the old corporation; another, W. H. Stokes, Jr., was a near relative. In these circumstances we can not hold that the sale of the property for $50,000 in cash is conclusive evidence of its actual cash value. On the other hand, it seems unlikely that it appreciated so much in the hands of the vendees that it was worth more than $200,000 a few days later. That it was worth more to the group of active business men who acquired it and had the credit necessary to secure operating capital than it was in the hands of Stokes is certain, but that it was worth four times the purchase price is very doubtful. The Commissioner has allowed an appreciation of 100 per cent over the purchase price. The expert witness testified to cost of reproduction rather than to actual cash value. In all the circumstances we are of the opinion that the record here fails to overcome the presumption that the Commissioner's computation of invested capital was correct.

The petitioner is entitled to depreciation on the cost of assets acquired subsequent to March 1, 1913. The assets in question were purchased for stock in 1916. The effect of our decision approving the Commissioner's computation of invested capital is to determine that the stock was worth par, or $100, per share. Its depreciable assets, therefore, cost the petitioner $85,000, and on that basis, at rates not in dispute, it is entitled to annual deductions from income on account of depreciation. On this issue the respondent is affirmed.

The evidence adduced by the petitioner shows no abnormality in income or invested capital in the year 1920 and, therefore, the Commissioner's refusal to compute the tax liability for such year, in conformity with section 328 of the Revenue Act of 1918 is approved.

*Decision will be entered for the respondent.*